**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**CHARLESTON DIVISION**

CHARLESTON AREA MEDICAL CENTER, INC.,

               Plaintiff,

v.                                  CIVIL ACTION NO.  2:09-cv-00573

NATIONAL UNION FIRE INSURANCE, et al.,

               Defendants.

**MEMORANDUM OPINION AND ORDER**

This multi-party insurance case involves a dispute over which insurance company, if any, must provide coverage to Charleston Area Medical Center ("CAMC") for a multi-million dollar settlement agreement that CAMC entered into with two women who were molested by a CAMC employee.  During the relevant time, CAMC held several insurance policies, two of which are at issue here.  The first was a policy that CAMC purchased from National Union Fire Insurance Company of Pittsburgh ("National Union") to provide coverage from May 1, 2008 through May 1, 2009.  CAMC purchased the second policy from Vandalia Insurance Company ("Vandalia") for coverage from May 1, 2008 to May 1, 2009.

By way of short summary, CAMC asserts that the National Union Policy provides coverage for the settlement.  National Union has denied coverage and has asserted a Third-Party Complaint against Vandalia requesting a declaratory judgment that CAMC's claims are covered by the Vandalia

Policy.  In addition, CAMC has asserted claims against both National Union and AIG Domestic Claims ("AIG"), the claims adjuster for the National Union Policy, under West Virginia Unfair Trade Practices Act ("UTPA").

Pending before the court are the following four cross-motions for summary judgment: (1) the Motion by AIG for Summary Judgment against CAMC [Docket 75]; (2) the Motion by National Union for Summary Judgment against CAMC [Docket 77]; (3) the Motion by National Union for Summary Judgment against Vandalia [Docket 79], and; (4) the Motion by CAMC for Partial Summary Judgment against National Union [Docket 85].[1]

For the reasons set forth below, AIG's Motion for Summary Judgment is **DENIED**.  National Union's Motions for Summary Judgment against CAMC and Vandalia are **DENIED**.  CAMC's Motion for Partial Summary Judgment is **GRANTED**.

## I.      Background

### A.      Underlying Events

The underlying events giving rise to the present insurance coverage dispute arose from claims made against CAMC by patients in 2008 and 2009.  Two[2]  female patients alleged that they were molested by a CAMC nursing assistant while being treated at CAMC.[3]  On December 16, 2008,[4]

---

[1] CAMC's Motion for Partial Summary Judgment was initially filed on February 18, 2011, and docketed as document number 73.  The Court later gave the parties leave to substitute the current redacted versions of the Motion and accompanying memorandum.

[2] The underlying settlement only involved two patients, however, the papers reference three victims.

[3] To protect their privacy, I will not refer to the patients by name.

[4] CAMC was informally notified of the patients' allegations by the patients' attorney
(continued...)

CAMC received notice of Patient One's claim, alleging that she was molested by the employee on June 17, 2008, and that as a result of the employee's conduct and CAMC's negligent supervision of its employee, she had suffered "psychological injury, embarrassment, humiliation, trauma, anguish, upset, worry, dread, and was otherwise injured in mind and body." (CAMC's Mot. Partial Summ. J. Ex. 2 [Docket 85-2], at 2.)  On January 21, 2009, CAMC received notice of Patient Two's claim, alleging that she was molested on October 3, 2008 and that as a result of this assault and CAMC's negligent supervision of its employee, she "suffered physical injury, pain, psychological injury, embarrassment, humiliation, trauma, anguish, upset, worry, dread, and was otherwise injured in mind and body." (CAMC's Mot. Partial Summ. J. Ex. 3 [Docket 85-3], at 3.)  Patient Two further alleged that she suffered "vaginal burning and irritation for days." (Id. at 2.)

On February 3, 2009, the patients' attorney sent CAMC a demand letter requesting an award of $11 million for both patients.  On February 17, 2009, CAMC entered into a settlement with both of the patients for a total of $2.55 million.  During this time, the instant dispute arose over which of CAMC's insurers, if any, must provide coverage to CAMC for the amount paid to the two patients in the settlement.  I will now briefly describe the insurance policies at issue.

### B.    National Union Policy

The National Union Policy provided Directors and Officers and Not-For-Profit Organization Liability Coverage and Employment Practices Liability Coverage to CAMC with a total aggregate limit of liability of $10 million for the entire policy and a retention/deductible of $250,000.

---

[4](...continued)
before receiving the actual notices of the claims pursuant to West Virginia's Medical Professional Liability Act.  The parties appear to agree, however, that the official notices serve as the "claim documents" in this case, and accordingly I will rely on these documents. (*See* CAMC's Mot. Summ. J. Ex. 4 [Docket 85-4], at 1.)

(CAMC's Mot. Partial Summ. J. Ex. 1 [Docket 85-1], at 2.) The policy, effective from May 1, 2008 through May 1, 2009, consists of three sections.  The first section contains the general terms and conditions of coverage for the entire policy.  (Id. at 7-17.)  The second section provides the terms of Directors and Officers and Not-For-Profit Organization Liability Coverage (the "D&O Section"), and defines covered wrongful acts and exclusions particular to the D&O Section. (Id. at 18-25.)  The third section provides the terms of Employment Practices Liability Coverage (the "EPL Section"), and similarly defines wrongful acts and exclusions particular to the EPL Section. (Id. at 26-31.)  The National Union Policy also contains additional endorsements amending the general terms and conditions of coverage.   (Id. at 94-116.)  A claim is only covered by the National Union Policy if it falls within the coverage language of either the D&O Section or the EPL Section and the claim does not fall within any relevant exclusion.  Thus, all three sections of the National Union Policy are relevant to the instant dispute.

First, with respect to coverage, CAMC and National Union dispute whether CAMC's claims are within the terms of either the D&O or the EPL Sections.  The D&O Section provides several categories of coverage for executives, individuals, and for CAMC as an organization.  The relevant portion of the D&O Section covers claims made for wrongful acts, which are defined as  "any breach of duty, neglect, error, misstatement, misleading statement, omission or act by or on behalf of the Organization."  (Id. at 20.)  Endorsement Number 9 operates to exclude coverage for claims "alleging, arising out of, based upon or attributable to the Insureds performance or rendering of or failure to perform or render medical or other professional services or treatments for others."  (Id. at 104-106.)  The EPL Section provides coverage for an "Employment Practices Violation" and "Non-Employment Discrimination", both of which are discussed in more detail below.

Second, the General Terms and Conditions contain an exclusion for any claim "alleging, arising out of, based upon, attributable to, or in any way involving, directly or indirectly, Bodily Injury or Property Damage." (Id. at 10.) This provision operates to exclude any such claim from coverage under the National Union Policy, regardless of whether the claim involved acts otherwise covered under the D&O or EPL Sections. As further discussed below, National Union and CAMC dispute whether CAMC's claims fall within this exclusion.

### C.    Vandalia Hercules Policy

I have, on several prior occasions, been asked to interpret a version of the "Hercules Policy" issued to CAMC by Vandalia and to determine the legal status of the relationship between CAMC, Vandalia, and various third-parties. While the third-parties and other players change, the nature of the Hercules Policy remains relatively constant throughout. Vandalia issued the "Hercules Policy" to CAMC, providing the following three "Groups" of coverage effective from May 1, 2008 to May 1, 2009: (1) Health Care Professional Liability under Group I; (2) Directors and Officers Liability, Employment Practices Liability, and Fiduciary Liability under Group II; and (3) "All coverages provided under this policy which are not listed in Group I and Group II above" under Group III. (Third-Party Pl. National Union's Mot. Summ. J. Ex. 1 [Docket 79-1], at 3.) These Groups, which are explained in more detail below, set out the terms of coverage for each category of loss.

National Union contends that Groups I and III of the Hercules Policy are relevant here. Group I provides Health Care Professional Liability coverage up to $10,000,000 per loss event and in the aggregate in excess of the continuing retained amount of $250,000 per loss event. (Id. at 27.) Group III provides several categories of coverage, including "Commercial General Liability." Group III provides coverage in an amount up to $10,000,000 per loss event and in the aggregate and the

Commercial General Liability under Group III has a continuing retained amount of $2,000,000 per loss event. (Id.) Neither Group I nor Group III of the Hercules Policy lists any underlying insurance policy. As discussed in more detail below, National Union contends that CAMC's losses are covered under Groups I and III of the Vandalia Policy while Vandalia denies that CAMC's claims are covered under either Group of the Vandalia Policy.

### D.      Procedural History of the Instant Action

On October 15, 2008, CAMC notified all of its insurance carriers, including National Union, of three potential claims, based on three patients' allegations that they were molested by a CAMC employee while being treated at CAMC. CAMC received a Notice of Claim under the West Virginia Medical Professional Liability Act from Patient One on December 16, 2008, and another from Patient Two on January 21, 2009. CAMC forwarded both of these notices to National Union, and National Union "retained" AIG to determine whether coverage existed under the National Union Policy. In a series of correspondence, AIG disclaimed coverage for a variety of reasons including: (1) failure to allege a "wrongful act"; (2) exclusion under the "bodily injury" provision; and (3) exclusion under the medical and professional services provision. During the course of the debate between CAMC and AIG regarding coverage under the National Union Policy, CAMC, with the consent of AIG,[5] settled both patients' claims for a total of $2.55 million.[6]

_____

[5] An email exchange between John Favilla, Assistant Vice President of AIG, and Dina Mohler of CAMC's Office of General Counsel indicates that CAMC notified AIG of mediation scheduled for February 17, 2009 and that AIG stated it would not "raise lack of consent as a bar to coverage." (National Union's Mot. Summ. J. Ex. 5 [Docket 77-5].)

[6] While the claims have been consolidated for the purposes of this litigation, the patients filed individual claims and the claims were treated distinctly by National Union and AIG. Accordingly, should the court determine that there is coverage, the $250,000 self-insured

(continued...)

On April 23, 2009, CAMC filed suit against National Union and AIG in the Circuit Court of Kanawha County, West Virginia.  CAMC's Complaint alleged claims for (1) breach of contract against National Union; (2) breach of the implied covenant of good faith and fair dealing against National Union; (3) violations of the West Virginia Unfair Trade Practices Act against National Union and AIG; and (4) punitive damages against National Union and AIG.  National Union and AIG removed the action to this court on the basis of diversity jurisdiction.

On May 26, 2009, National Union and AIG filed an Answer to CAMC's Complaint as well as a Third-Party Complaint against Vandalia Insurance Company.  The Third-Party Complaint requests a declaratory judgment that the Vandalia Hercules Policy, rather than the National Union Policy, provides coverage for CAMC's claims.  The parties have filed four cross-motions for summary judgment, which, after oral argument, are ripe for review.

## II.    Summary Judgment Standard

To obtain summary judgment, the moving party must show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  In considering a motion for summary judgment, the court will not "weigh the evidence and determine the truth of the matter."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). Instead, the court will draw any permissible inference from the underlying facts in the light most favorable to the nonmoving party.  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986).

---

[6](...continued)
retention should apply to each claim.

Although the court will view all underlying facts and inferences in the light most favorable to the nonmoving party, the nonmoving party nonetheless must offer some "concrete evidence from which a reasonable juror could return a verdict in his [or her] favor." *Anderson*, 477 U.S. at 256. Summary judgment is appropriate when the nonmoving party has the burden of proof on an essential element of his or her case and does not make, after adequate time for discovery, a showing sufficient to establish that element. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). The nonmoving party must satisfy this burden of proof by offering more than a mere "scintilla of evidence" in support of his or her position. *Anderson*, 477 U.S. at 252. Likewise, conclusory allegations or unsupported speculation, without more, are insufficient to preclude the granting of a summary judgment motion. *See Felty v. Graves-Humphreys Co.*, 818 F.2d 1126, 1128 (4th Cir. 1987); *Ross v. Comm'ns Satellite Corp.*, 759 F.2d 355, 365 (4th Cir. 1985), *abrogated on other grounds*, 490 U.S. 228 (1989).

## III.    Analysis

The four pending motions for summary judgment involve three distinct disputes. First, the central dispute in this litigation, between CAMC and National Union, is whether the National Union Policy provides coverage for the underlying settlement paid by CAMC, less any retained amounts. Second, National Union and Vandalia dispute whether Vandalia's Hercules Policy provides coverage for CAMC's claims, and, if so, whether this coverage is primary or excess coverage. Third, CAMC and AIG dispute whether AIG violated the UTPA. I will address each of these disputes in turn.

The court begins its analysis of an insurance coverage dispute by giving the terms of the insurance policy their plain, ordinary meaning. *See Mylan Labs. Inc. v. Am. Motorists Ins. Co.*, 700

S.E.2d 518, 524 (W. Va. 2010).[7]  When those terms are "clear and unambiguous, they are not subject to judicial construction or interpretation." *Id.* (internal quotation marks omitted).  Where, however, the language of an insurance policy provision "is reasonably susceptible of two different meanings or is of such doubtful meaning that reasonable minds might be uncertain or disagree as its meaning, it is ambiguous." *Id.* (internal quotation marks omitted).  Whether an insurance contract is ambiguous is a question of law for the court to decide.  *Id.*  Moreover, it is "well-settled law in West Virginia that ambiguous terms in insurance contracts are to be strictly construed against the insurance company and in favor of the insured." *Id.* (internal quotation marks omitted).

As the Supreme Court of Appeals of West Virginia has stated, in "actions to determine applicable coverages under a policy of insurance," an insured plaintiff "must prove both the existence of an applicable insurance contract and its material terms." *Camden-Clark Memorial Hosp. Ass'n v. St. Paul Fire & Marine Ins. Co.*, 682 S.E.2d 566, 574 (W. Va. 2009).  "It is only when the plaintiffs have established a prima facie case of coverage that the burden of production shifts to the defendants." *Id.*  Thus the defendant insurer "seeking to avoid liability through the operation of an exclusion has the burden of proving the facts necessary to the operation of that exclusion." *Id.* (internal quotation marks omitted).  Moreover, "[w]here the policy language involved is exclusionary, it will be strictly construed against the insurer in order that the purpose of providing indemnity not be defeated." *Id.* (internal quotation marks omitted); *see also Payne v. Weston*, 466 S.E.2d 161, 166 (W. Va. 1995) (observing that construing ambiguities against the

---

[7] West Virginia's substantive law applies to this diversity action.  *See Castillo v. Emergency Med. Assocs., P.A.*, 372 F.3d 643, 646 (4th Cir. 2004) (citing *Erie R.R. Co. v. Tompkins*, 304 U.S. 66 (1938)).

insurance company is particularly relevant when "dealing with exceptions and words of limitation").

A.      **Coverage Under the National Union Policy**

The question of whether the National Union provides Policy provides coverage for CAMC's settlement of the underlying action is the central dispute of this lawsuit.  CAMC seeks coverage under two Sections of the National Union Policy—the Directors and Officers Liability Coverage Section (the "D&O Section") and the Employment Practices Liability Section (the "EPL Section"). National Union denies that CAMC's claims are covered under any section and relies on both the coverage language of the Policy as well as several exclusions.  National Union further contends that CAMC's claims are covered by the Vandalia Hercules Policy rather than the National Union Policy.

1.      **Coverage Language of the National Union Policy**

For clarity, my analysis of coverage under the National Union Policy consists of two steps. First, I will consider whether CAMC's claims fall under the coverage language of either the D&O Section or the EPL Section (or both).  Second, assuming CAMC's claims constitute a covered "wrongful act" under at least one of the Sections, I will determine which exclusions, if any, apply.

I turn first to the D&O Section, which provides coverage for "Organization Loss arising from a Claim . . . for any actual or alleged Wrongful Act of the Organization."  (CAMC's Mot. Summ. J. Ex. 1 [Docket 85-1], at 18).  "Wrongful Act" is defined, in pertinent part, as "any breach of duty, neglect, error, misstatement, misleading statement, omission or act by or on behalf of the Organization."  (Id. at 20.)  CAMC asserts that the patients' negligent supervision claims against CAMC are a "wrongful act" under the D&O Section.  In response, National Union does not explicitly deny that negligent supervision claims are covered by the language of the D&O Policy.

-10-

Rather, National Union relies on general principles of insurance law, arguing that D&O Policies are not designed to provide general liability coverage and that negligent supervision claims cannot be used to trigger insurance coverage that does not otherwise exist.

According to the patients, CAMC negligently breached its duty to its patients by failing to adequately screen, train, and monitor its employee, and, as a result, that employee molested patients on at least three occasions.  Courts in West Virginia recognize negligent retention and supervision of an employee as an independent cause of action.  *See, e.g., McCormick v. West Virginia Dep't of Public Safety*, 503 S.E.2d 502, 506 (W. Va. 1998).  Because CAMC settled the patients' negligent supervision claims, with AIG's permission, before any judicial proceedings were initiated, it would be inappropriate, if not impossible, for this court to unravel the patients' underlying negligent supervision claims against CAMC beyond the description of those claims in the notices provided to National Union.  By the plain language of the D&O Section, CAMC's negligent supervision of its employee constitutes "neglect" or a "breach of duty" by the insured organization.

National Union is correct that a party may not rely on an unsupported negligent supervision claim in a "transparent attempt to trigger insurance coverage by characterizing allegations of intentional tortious conduct under the guise of negligent activity."  *Smith v. Animal Urgent Care, Inc.*, 542 S.E.2d 827, 834 (W. Va. 2000); *see Evanston Ins. Co. v. Radcliff*, 2006 WL 328147, at *3 (S.D. W. Va. 2006).  Because the patients have  identified a factual basis for their negligent supervision claims, that principle is inapposite here.[8]  National Union's reliance on the categorical

---

[8] National Union also fails to acknowledge that much of its cited case law deals with the interplay between a negligent supervision claim and an intentional act exclusion, which is an exclusion of an entirely different nature than the bodily injury exclusion at issue here.

nature of coverage under Directors and Officers Liability Policies generally is similarly misplaced. The issue is whether CAMC's claims are covered by the specific language of the D&O Section of the National Union Policy, not whether such claims fit within the abstract notion of what a "D&O claim" entails.  Moreover, CAMC's claim appears to be precisely the type of claim covered by the instant D&O Policy—a claim brought against the Organization based on its breach of an independent duty.  Accordingly, I **FIND** that the D&O Section provides coverage for CAMC's claims.  Because I **FIND** that coverage exists under the D&O Section, I need not consider whether coverage exists under the EPL Section.

### 2. Exclusions Under the D&O Section of the National Union Policy

Having found that CAMC's claims fall under the coverage language of the D&O Section of the National Union Policy, I now must consider whether any exclusions apply.  Because CAMC has made a prima facie case for coverage under the D&O Section, the burden now shifts to National Union to prove that any exclusion operates to deny coverage.  National Union contends that two exclusions apply to CAMC's claims:  (1) an exclusion for claims involving bodily injury and (2) an exclusion for claims arising out of the performance of medical or professional services.

### a. Bodily Injury Exclusion

The General Terms of the National Union Policy contain several exclusions, including, the "bodily injury exclusion" which provides that:

> The Insurer shall not be liable to make any payment for Loss in connection with a Claim made against an Insured . . . alleging, arising out of, based upon, attributable to or in any way involving, directly or indirectly, Bodily Injury or Property Damage.

(CAMC's Mot. Summ. J. Ex. 1 [Docket 85-1], at 10.)  Bodily Injury is further defined as "physical injury, sickness or disease (other than emotional distress or mental anguish), including death resulting therefrom." (Id. at 7.)  National Union argues that CAMC's claims fall under this exclusion because the patients alleged bodily injury in their claims against CAMC.  CAMC disputes that the claims in any way involve bodily injury.  CAMC further argues that even if the patients' claims tangentially involve bodily injury, they are nevertheless covered because CAMC's negligent supervision was the "proximate cause" of its losses.  CAMC asserts that the court should only consider the proximate cause of CAMC's losses, i.e., the alleged negligent supervision, and not any exclusions that depend on "the nature of the resulting damage."  (Mem. Supp. CAMC's Mot. Summ. J. [Docket 86], at 10-13.)

Under West Virginia law, the concept of bodily injury—as opposed to personal injury—is relatively narrow.[9]  *See Smith,* 542 S.E.2d at 831.  "The term 'personal injury' is broader and includes not only physical injury but also any affront or insult to the reputation or sensibilities of a person." *Id.* (internal quotation marks omitted).  In the present case, it is undisputed that the patients suffered personal injury.  The relevant question is whether they suffered bodily injury as well.  The West Virginia Supreme Court of Appeals has not defined the precise contours of bodily injury, but it has provided some useful guideposts.  Of course, bodily injury is often evident from the face of the record, such as in cases involving permanent and debilitating physical harm.  In other cases, it is clear that a claimant has suffered solely emotional, rather than bodily injuries.  Between these two

---

[9] While not directly relevant to the present case, the West Virginia Code defines "bodily injury" in the context of criminal law as "substantial physical pain, illness or any impairment of physical condition."  W. Va. Code § 61-2-9a(f)(1) (2001).

clear cut examples, a broad spectrum of possible injuries exists, involving some combination of physical and emotional injuries.

First, there are those injuries which result from physical contact. The West Virginia Supreme Court has explicitly rejected the "contention that the allegation of 'physical contact' in the complaint is sufficient to trigger the 'bodily injury' component of the liability policy." *Smith*, 542 S.E.2d at 831, n. 12. Indeed, the *Smith* Court made clear that physical contact does not necessarily result in bodily injury. *Id.* In determining whether a person suffered bodily injury, the inquiry must focus on the nature of the injuries rather than on the act that resulted in such injuries. Accordingly, National Union cannot rely solely on the physical contact in this case, but rather must establish that the patients suffered some actual bodily injury from this contact.

Another type of bodily injury is physical symptoms or manifestations of emotional or mental injury. West Virginia, like a majority of jurisdictions, has held that purely mental or emotional injuries, absent some physical manifestation do not "fall within a definition of 'bodily injury.'" *Smith*, at 831. It does not appear from the record, however, that the patients' alleged "bodily injuries" were the physical manifestations of emotional injury. Moreover, the bodily injury exclusion does not include emotional distress or mental anguish. Accordingly, I need not determine what, if any, physical manifestations of emotional injuries would constitute "bodily injury" under West Virginia law.

In the present case, the patients were molested by a CAMC employee who touched these women in a sexual manner and both women suffered emotional injuries as a result. It is less clear to the court, however, whether either of these women suffered or alleged *bodily* injury in addition

-14-

to their emotional injuries.  Indeed, while the trauma of sexual assault and sexual abuse cannot be understated, the injuries resulting from a sexual assault are often largely emotional.  *See* Katharine K. Baker, *Gender and Emotion in Criminal Law*, 28 Harv. J.L. & Gender 447, 453 (2005) ("It is true that the harm of rape, unlike that of battery, can be primarily emotional and thus difficult to verify with objective evidence, but this does not in any way negate its seriousness.").[10]  As courts and legislators in this country have long recognized, rape is "highly reprehensible, both in a moral sense and in its almost total contempt for the personal integrity and autonomy of the female victim." *Coker v. Georgia*, 433 U.S. 584, 597 (1977).  The Supreme Court has emphasized that, "[s]hort of homicide, it is the 'ultimate violation of self.'" *Id.*  Clearly, sexual assault victims may suffer physical injuries in addition to emotional ones, either during an assault or as physical symptoms of emotional injuries.  The patients' claims against CAMC, however, consist largely of alleged emotional injury.  Since there is no evidence that the alleged "bodily injuries" in this case involve physical manifestations of emotional injury, National Union must establish that the patients alleged or suffered some actual bodily injury.  As the patients each made distinct allegations, I will consider National Union's arguments with respect to each of the patients.

Patient One's Notice of Claim does not contain any allegation of "bodily injury" aside from the final phrase which states that she was "otherwise injured in mind and body."  (CAMC's Mot. Partial Summ. J. Ex. 2 [Docket 85-2], at 2.)  In her deposition, Patient One stated that it "was uncomfortable" when the employee touched her, but when asked if she had "any residual soreness,

---

[10] As the United States Supreme Court has recognized, even in heinous instances of child rape, "[r]ape has a permanent psychological, emotional, and *sometimes* physical impact on the child." *Kennedy v. Louisiana*, 554 U.S. 407, 435 (2008)(emphasis added).

irritation, [or] discomfort after she left the hospital in her vaginal area," Patient One explicitly responded, "[n]o it wasn't really sore it was just; I would say I could just feel it." (National Union's Mot. Summ. J. Ex. 13 [Docket 77-13], at 5-6.)  I **FIND** that Patient One's generalized assertions in her Notice of Claim and her description of her injuries in her deposition are insufficient to establish that Patient One alleged or suffered "bodily injury".  It is clear from her Notice of Claim and deposition that Patient One's injuries were the mental and emotional trauma that she suffered as a result of being molested.  Bearing in mind that National Union, the insurer, has the burden of demonstrating the applicability of a policy exclusion and that "[w]here the policy language involved is exclusionary, it will be strictly construed against the insurer," *Camden-Clark Mem'l Hosp. Ass'n*, 682 S.E.2d at 574, I **FIND** that National Union has failed to demonstrate that as a matter of law that Patient One's claim falls under the bodily injury exclusion.

Patient Two's Notice of Claim contains the same general allegations that she was "otherwise injured in mind and body" and that she suffered from "vaginal burning and irritation for days". (CAMC's Mot. Partial Summ. J. Ex. 3 [Docket 85-3], at 2-3.)  In her deposition, Patient Two states that it "irritated her" and "began to smart" when the nursing assistant touched her. (National Union's Mot. Summ. J. Ex. 16 [Docket 77-16], at 6.) When asked if the touching caused pain, Patient Two responded that it "caused dryness" and that she "grated (phonetic) for three or four days till it gradually left."  (Id.)  National Union also relies on the February 3, 2009 demand letter in which Patient Two's attorney states that, "[a]ccording to the nurse's notes, she [Patient Two] told the nurse that 'a male attendant from ER massaged my genitalia, I'm on fire down there.'" (National Union's Mot. Summ. J. Ex. 3 [Docket 77-3], at 6.)  As *Smith* made clear, allegations of physical contact do not necessarily result in bodily injury.  Patient Two complains of irritation and minor physical

discomfort, and National Union has failed to provide sufficient evidence or argument that these allegations relate to "bodily injury" under the policy.  Accordingly, while Patient Two's claims present a closer case than Patient One's, I nevertheless **FIND** that National Union has failed to carry its burden of demonstrating that Patient Two's claim falls under the bodily injury exclusion.

### b.   The Medical and Professional Services Exclusion

National Union also argues that CAMC's claims fall under the "medical and professional services exclusion" found in Endorsement Number 9, which operates to exclude coverage for claims "alleging, arising out of, based upon or attributable to the Insureds performance or rendering of or failure to perform or render medical or other professional services or treatments for others." (CAMC's Mot. Partial Summ. J. Ex. 1 [Docket 85-1], at 104-106.)  Under National Union's theory, CAMC's claims are excluded because CAMC's employee molested the patients while providing professional services, including placing electrodes on a patient and attending to the "toileting" of another patient.  (National Union's Mem. Supp. Mot. Summ. J. [Docket 78], at 13.)  National Union further argues that CAMC's claims fall under this exclusion because the claims were brought and settled under the West Virginia Medical Professional Liability Act.  In response, CAMC argues that the patients' claims, which were "premised entirely on allegations of a non-medical nature in the hiring, employing, and retention of the nursing assistant," did not involve the "performance or rendering of a medical or professional service" to the patients.  (CAMC's Mem. Opp. National Union's Mot. Summ. J. [Docket 87], at 11-12.)  CAMC contends that this exclusion applies only to claims asserting some breach of a standard of medical care in the performance of a medical act and notes that the patients "expressly disavowed that they were making any claim for the breach of a standard in the performance of medical care."  (Id.)

In this case, it is clear that CAMC's claims do not allege, arise out of, or rely on CAMC's performance or rendering of or failure to perform or render medical or other professional services. Clearly, the patients received medical treatment while at CAMC and CAMC's employee undoubtedly provided some of this treatment. The claims here, however, do not involve any treatment of the patients (or lack thereof). Rather, these claims are based on the employee's intentional and offensive acts, independent of any treatment or medical service that he may have been providing. CAMC's employee was not providing any type of medical or professional service when he molested these women and the claim documents explicitly disclaim any medical negligence or other claim relating to the performance of medical or professional services. Furthermore, the fact that the patients filed notices of their claims under the West Virginia Medical Professional Liability Act is not dispositive. Each patient explicitly disclaimed that her claim fell under the Act and provided CAMC with notice only as a precautionary measure. Indeed, it appears that the patients' claims would not fall under the Act, which "recognizes a health care provider's legal responsibility for damages, in tort or in contract, to a person who has sustained injuries or death *as a result of such provider's provision of, or failure to provide, health care services to a patient*." *Osborne v. U.S.*, 567 S.E.2d 677, 682 (W. Va. 2002) (emphasis added). I **FIND** that National Union has failed to demonstrate that CAMC's claims fall under the "medical and professional services" exclusion.

Having found that the D&O Section of the National Union Policy provides coverage for CAMC's claims and having further found that National Union has failed to persuade the court that any exclusions operate to deny coverage, I **FIND** that CAMC's claims are covered by the National Union Policy. Accordingly, CAMC's Motion for Partial Summary Judgment against National Union

-18-

[Docket 85] is **GRANTED**.  National Union's Motion for Summary Judgment against CAMC [Docket 77] is **DENIED**.

      **B.**      **Coverage Under the Vandalia Hercules Policy**

I now turn to National Union's Motion for Summary Judgment on its Third-Party Complaint declaratory judgment claim against Vandalia.  National Union asserts that the Vandalia Hercules Policy, rather than the National Union Policy, provides coverage for CAMC's claims.  Vandalia contends that CAMC's claims are not covered by the Hercules Policy.

I first note that it is far from clear to this court what, if any, actual controversy actually exists between National Union and Vandalia.  The coverage dispute between National Union and CAMC is clear, just as any coverage dispute between CAMC and Vandalia over whether coverage existed under the Hercules Policy would be.  These are contract disputes between respective parties to the contracts.  There is, however, no contractual relationship between National Union and Vandalia. National Union seeks to defend itself against CAMC by pointing the finger elsewhere for coverage. Even if the Hercules Policy provided primary coverage for CAMC's claims, National Union has provided no legal support for the proposition that the possibility of coverage under another policy held by CAMC with another insurance company creates a live and justiciable controversy between the two respective insurance carriers.

My observations on this point, are, however, moot, as I have already determined that the National Union Policy provides coverage for CAMC's claims.  As previously discussed, the Hercules Policy provides three "Groups" of coverage.  National Union contends that CAMC's claims fall under Group I and Group III of the Hercules Policy, which provide primary coverage.  Group II

of the Hercules Policy, provides coverage for "Directors and Officers Liability, Employment

Practices Liability and Fiduciary Liability," in excess of the underlying insurance policies which

provide coverage for the same categories of losses.  As explained above, I have determined that the

D&O Section of the National Union Policy does in fact cover CAMC's claim.  *See supra* Part III.A.

In light of this ruling and the terms of the Hercules Policy, CAMC's losses would fall under Group

II rather than Group I or Group III of the Hercules Policy.  Group II, however, provides *excess*

coverage, and nothing in the record suggests that CAMC has exhausted the underlying insurance

policies or triggered coverage under Group II of the Hercules Policy.  (Third-Party Pl. National

Union's Mot. Summ. J. Ex. 1 [Docket 79-1], at 25.)  Accordingly, National Union's Motion for

Summary Judgment on its Third-Party Complaint against Vandalia is **DENIED**.

### C.      West Virginia Unfair Trade Practices Act Claims Against AIG

Finally, having determined that coverage exists for CAMC's claims under the National Union

Policy, I now turn to the third dispute involving  CAMC's UTPA claims against AIG.  In its

Complaint, CAMC asserted that National Union and AIG violated various provisions of the UTPA.

CAMC relies on correspondence in the record and deposition testimony in support of its allegations.

AIG has moved for summary judgment on these claims and asserts that there are no genuine issues

of material fact with respect to AIG's liability for any of these alleged violations.[11]

---

[11] I note that National Union has not moved for summary judgment on CAMC's UTPA
claims.  AIG's unsupported assertion in a footnote that "[o]bviously CAMC cannot assert that
both AIG Domestic Claims and National Union are liable under the UTPA for AIG Domestic
Claims' claim processing," is inaccurate.  (AIG's Mem. Supp. Mot. Summ. J. [Docket 76], at
11.)  CAMC may not "double recover" by asserting claims against both AIG and National Union
for the same action, however it is possible that, in the processing of CAMC's claims, National
Union and AIG each independently violated the UTPA.  Accordingly, CAMC's UTPA claims
(continued...)

-20-

With respect to the specific UTPA claims against AIG at issue here, CAMC asserts that AIG violated West Virginia Code subsections 33-11-4(9)(a), (b), (d), (e), (f), (g), and (h) of the UTPA, which provide as follows:

> No person shall commit or perform with such frequency as to indicate a general business practice any of the following:
>
> > (a) Misrepresenting pertinent facts or insurance policy provisions relating to coverages at issue;
> >
> > (b) Failing to acknowledge and act reasonably promptly upon communications with respect to claims arising under insurance policies; . . .
> >
> > (d) Refusing to pay claims without conducting a reasonable investigation based upon all available information;
> >
> > (e) Failing to affirm or deny coverage of claims within a reasonable time after proof of loss statements have been completed;
> >
> > (f) Not attempting in good faith to effectuate prompt, fair and equitable settlements of claims in which liability has become reasonably clear;
> >
> > (g) Compelling insureds to institute litigation to recover amounts due under an insurance policy by offering substantially less than the amounts ultimately recovered in actions brought by the insureds, when the insureds have made claims for amounts reasonably similar to the amounts ultimately recovered;
> >
> > (h) Attempting to settle a claim for less than the amount to which a reasonable man would have believed he was entitled by reference to written or printed advertising material accompanying or made part of an application;

W. Va. Code §§33-11-4(9)(a)-(h).  Under West Virginia law, determinations of whether an insurer has violated certain subsections of the UTPA are normally left to the jury.  *See, e.g., Hicks v. Jones*, 617 S.E.2d 457, 465 (W. Va. 2005) (stating that the determination of a "fair and equitable" settlement under W. Va. Code § 33-11-4(9)(f) is "ordinarily one of fact for the jury."); *Jackson v. State Farm Mut. Auto Ins. Co.*, 600 S.E.2d 346, 354 (W. Va. 2004) (stating that a determination of

---

[11](...continued)
against National Union remain pending.

whether an insurer refused to pay a claim without conducting reasonable investigation under W. Va. Code § 33-11-4(9)(d) is ordinarily for the jury.).  Moreover, CAMC has identified factual support in the record, including correspondence between AIG and CAMC employees and deposition testimony, in support of its claims that AIG misrepresented insurance policy provisions relating to coverage, failed to affirm or deny coverage within a reasonable time after CAMC submitted proof of loss, and  offered substantially less than the amount ultimately recovered in the present action. Accordingly, I **FIND** that CAMC's UTPA claims present genuine issues of material fact that require resolution by a jury.  Accordingly, AIG's Motion for Summary Judgment is **DENIED**.

## V.      Conclusions

For the foregoing reasons, AIG's Motion for Summary Judgment [Docket 75] is **DENIED**. National Union's Motion for Summary Judgment against CAMC [Docket 77] is **DENIED**.  National Union's Motion for Summary Judgment against the third-party defendant, Vandalia [Docket 79] is **DENIED**.  CAMC's Motion for Partial Summary Judgment against National Union [Docket 85] is **GRANTED**.

The court **DIRECTS** the Clerk to send a copy of this Order to counsel of record and any unrepresented party.

ENTER:      June 1, 2011

Joseph R. Goodwin, Chief Judge